## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                    )
**EURO-PRO OPERATING LLC,**                         )
                                                    )
    **Plaintiff,**                )
                                                    )
    **v.**                         )      **Civil Action No. 12-10568-DJC**
                                                    )
**TTI FLOOR CARE NORTH AMERICA,**                   )
                                                    )
    **Defendant.**                  )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                          July 11, 2012

## I.      Introduction

Plaintiff Euro-Pro Operating LLC ("Euro-Pro"), a company that manufactures, markets and distributes steam cleaning and vacuum products, has sued a competitor, TTI Floor Care North America ("TTI"), owner of the Hoover brand of steam cleaners and vacuums ("Hoover"), alleging false advertising and unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), unfair business practices in violation of Mass. Gen. L. c. 93A, § 11, and false advertising in violation of Mass. Gen. L. c. 266, § 91 *et seq.*  Specifically, Euro-Pro objects to a TTI advertising campaign that promotes two Hoover products, the "TwinTank" steam mop and the "WindTunnel" vacuum, and compares them unfavorably to various competing products, including Euro-Pro's "Shark" steam mop and "Shark Navigator" vacuum.  Euro-Pro moved for a preliminary injunction prohibiting TTI from making certain types of claims about the TwinTank or WindTunnel products.  For the reasons set forth below, Euro-Pro's motion for a preliminary injunction is DENIED.

1

## II.     Burden of Proof and Standard of Review

A preliminary injunction is an extraordinary and drastic remedy.  Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011).  To obtain a preliminary injunction, Euro-Pro "bear[s] the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest."  Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). "The *sine qua non* of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  Unless the parties' competing versions of events are "in sharp dispute such that the 'propriety of injunctive relief hinges on determinations of credibility,'" Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 117 (D. Mass. 2010) (quoting Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995)), the Court is free to accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Id. at 114 n.2 (quoting Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)).

## III.    Factual Background

### A.     Euro-Pro

Euro-Pro is a Massachusetts company that manufactures, markets and distributes household appliances, including steam mops and vacuums.  Declaration of Euro-Pro President Mark Barrocas,

D. 9 at ¶ 3.[1]  In 2007, Euro-Pro began marketing a line of products under the Shark name in the United States, and recently introduced under that name a new steam mop model, the Shark Professional Steam Pocket Mop Model No. S3601 ("Shark"), and two new vacuum models, the Shark Navigator Lift-Away Model No. NV350 and the Shark Navigator Lift-Away Pro Model No. NV356E (collectively "Shark Navigator").  Barrocas Decl., D. 9 at ¶ 4-5.  The Shark steam mop cleans and sanitizes hard, non-porous surfaces without the use of chemicals using only water-based steam.  Id. at ¶ 4. The Shark Navigator is an upright bagless vacuum that can be converted into a portable handheld vacuum.  Id. at ¶ 5.  Euro-Pro asserts that it has spent "tens of millions of dollars" promoting and marketing the Shark and Shark Navigator through national television and print advertising campaigns, advertising inside retail stores that sell Shark and Shark Navigator products, product packaging, and internet advertising.  Id. at ¶ 6-7.

## B.    Hoover

TTI is a distributor of various tools and appliances, including floor and carpet care appliances.  Declaration of TTI Vice President of Marketing Michael Brian Kirkendall, D. 21 at ¶ 2.  In 2007, TTI purchased Hoover, a company that has manufactured and sold floor care products since 1908.  Kirkendall Decl., D. 21 at ¶ 2; TTI Brief, D. 20 at 2.  Hoover introduced a steam mop model, the TwinTank Steam Mop Model WH20200 and WH20200TV ("TwinTank") earlier this year, and Hoover also sells a vacuum model, the WindTunnel Air ("WindTunnel"), the most current version of which is Model UH70402.  Kirkendall Decl., D. 21 at ¶¶ 4, 13; Declaration of Hoover Test Laboratories Manager Daniel Miller, D. 22 at ¶¶ 15, 19.  The TwinTank steam mop has two

---

[1] References to docketed material are abbreviated as "D. __," with pagination determined by the Court's uniform docketing pagination system rather than the various methods of original pagination in the parties' filings.

tanks, one for water and one for a detergent cleaning solution; the TwinTank can be operated either on a "steam only" setting to disinfect hard, non-porous surfaces or on a "cleaning" setting that injects detergent into the mop's steam flow to remove stains, grease or other soiling foreign matter. Miller Decl., D. 22 at ¶ 28.   The WindTunnel is an upright lightweight multi-cyclonic bagless vaccum.  Id. at ¶ 19.   As a general matter, the TwinTank competes with the Shark and the WindTunnel competes with the Shark Navigator.  See generally Barrocas Decl., D. 9; Kirkendall Decl., D. 21.

### C.    The Hoover Advertising Campaign

On or about February 15, 2012, Hoover recorded two new infomercials promoting TwinTank and WindTunnel products.   Declaration of Infomercial Monitoring Service, Inc., President Sam Catanese, D. 10 at ¶ 10.  By March 26, 2012, Hoover had aired the WindTunnel infomercial over 100 times on at least 29 different television networks at a cost of over $1.4 million and had aired the TwinTank infomercial over 140 times on at least 26 different networks at a cost of over $1.6 million. Catanese Decl, D. 10 at ¶ 11-12.  The infomercials were also accessible on the internet.  See, e.g., DRTV Portfolio of Long-Form Infomercials, http://www.acquirgy.com/drtv-long-form (last visited July 11, 2012); Euro-Pro Brief, D. 8 at 4 (filed on April 4, 2012 and citing to both Hoover's website and to the aforementioned Acquirgy website).    Additionally, copies of the infomercials and transcriptions thereof have been filed with the Court.  See TwinTank Video, D. 1-3 (compact disc copy of TwinTank infomercial); WindTunnel Video, D. 1-4 (compact disc copy of WindTunnel infomercial); Video Transcripts, D. 11-1 and 11-2 (transcriptions of infomercials). Each infomercial includes various demonstrations of Hoover products and competitor products operating in a structure described as "Hoover's Dirty House," interspersed with testimonials to Hoover products.  See

generally TwinTank Video, D. 1-3; WindTunnel Video, D. 1-4. Euro-Pro takes issue with various

aspects of these infomercials; each area of dispute is discussed in this Court's analysis further below.

## IV.    Procedural History

Euro-Pro filed its complaint in this action on March 28, 2012, and filed the instant motion

for a preliminary injunction, along with a supporting memorandum and various declarations and

exhibits on April 4, 2012. See D. 1, 7, 8, 9, 10, 11, 12, 13. On May 3, 2012, TTI filed its

opposition, also supported with a memorandum and various declarations and exhibits. See D. 20,

21, 22, 23.[2] The Court then scheduled a hearing for May 18, 2012. D. entry for 5/9/12. On the eve

of that hearing, Euro-Pro filed a reply brief accompanied by nearly two hundred pages of

declarations and exhibits. See D. 28, 28-1, 28-2, 29. The Court held the May 18th hearing on the

preliminary injunction motion as scheduled and granted TTI leave to submit a post-hearing sur-reply

in light of Euro-Pro's late filing. See D. 30. TTI filed its sur-reply accompanied by still more

declarations and exhibits on June 1, 2012. See D. 34, 35, 36, 37. The preliminary injunction motion

is now ripe for resolution.[3]

## V.    Discussion

As discussed above, the critical consideration of a motion for preliminary injunction is the

---

[2] On May 3, 2012, TTI also filed its answer, see Answer, D. 24, which includes
counterclaims alleging that Euro-Pro's advertising campaigns in support of its Shark products
violates the Lanham Act and the Massachusetts Unfair Practices Act. Answer, D. 24 at ¶¶ 135-
160. The counterclaims are not at issue in the instant preliminary injunction motion.

[3] On June 5, 2012, Euro-Pro requested leave to file a further brief in support of its
preliminary injunction motion, Euro-Pro Motion for Leave, D. 38. Such a document would be
the third separate brief filed by Euro-Pro in support of its preliminary injunction motion. See
Euro-Pro Brief, D. 9; Euro-Pro Reply, D. 28-1, 28-2. TTI has opposed Euro-Pro's motion for
leave. TTI Opposition, D. 39. In light of the thorough briefing and oral argument already before
the Court, the Court DENIES Euro-Pro's request for leave to file an additional brief.

movant's likelihood of success of the merits of its claims.  Since Euro-Pro's motion rises or falls on this consideration, the Court focuses its attention on this inquiry.

## A.      Likelihood of Success on the Merits

Although EuroPro has brought false advertising claims under Mass. Gen. L. chapters 93A and chapter 266, § 91, in addition to its claims under section 43(a) of the Lanham Act, the state law claims all rise and fall on the merits of the Lanham Act claims.  Am. Med. Sys. v. Biolitec, Inc., 774 F. Supp. 2d 375, 393 (D. Mass. 2011) (state law truth-in-advertising claims under Mass. Gen. L. c. 266, § 91 turn on Lanham Act analysis); Empire Today LLC v. Nat'l Floors Direct, Inc., 788 F. Supp. 2d 7, 26 (D. Mass. 2011) (false advertising claims under Mass. Gen. L. c. 93A turn on Lanham Act analysis).  Under the Lanham Act:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

A Lanham Act claim brought under section 43(a) has five elements: first, a false or misleading description of fact or representation of fact by the defendant in a commercial advertisement about his own or another's product; second, materiality, such that the misrepresentation is likely to influence the purchasing decision; third, that the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; fourth, that the defendant placed the false or misleading statement in interstate commerce; and finally, injury to the plaintiff.  Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st

6

Cir. 2002); Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 n.6 (1st Cir. 2000).

There are two types of false advertising claims under the Lanham Act claim: first, literally false claims; and second, implicitly false claims, where the representation at issue is misleading even if literally true or ambiguous. Cashmere & Camel Hair, 284 F.3d at 310-11. "If [an] advertisement is literally false, the court may grant relief without considering evidence of consumer reaction." Clorox, 228 F.3d at 33 (internal citations omitted). "In the absence of such literal falsity, an additional burden is placed upon the plaintiff to show that the advertisement, though explicitly true, nonetheless conveys a misleading message to the viewing public." Id. "To satisfy its burden [in the absence of literal falsity], the plaintiff must show how consumers have actually reacted to the challenged advertisement rather than merely demonstrating how they could have reacted," id., a fact "most often proven by consumer survey data." Id. at 36. Here, Euro-Pro has not alleged that the infomercials in question are implicitly false or misleading, nor has it provided any customer survey data or other evidence in support of a implicitly false claim; instead, Euro-Pro is pursuing its claims solely on a literal falsity theory. See Euro-Pro Brief, D. 8 at 5, 9, 12-15, 17, 19-22; Transcript of May 12, 2012 Hearing, D. 31 at 4, 6, 8-9, 12-13, 24-28, 30, 33-34, 38.

The analysis of a false advertising allegation predicated on literal falsity proceeds in two steps. First, the Court determines what (if any) specific claim the advertisement at issue actually conveyed. Clorox, 228 F.3d at 34. "Although factfinders usually base literal falsity determinations upon the explicit claims made by an advertisement, they may also consider any claims the advertisement conveys by 'necessary implication.'" Id. at 34-35. "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the

claim as readily as if it had been explicitly stated." Id. at 35.  Second, once the Court has determined the specific claim conveyed by the advertisement (if the Court is in fact able to identify a specific claim), the Court must then determine whether the specific claim is false.  Id. at 34.  "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, . . . the less likely it is that a finding of literal falsity will be supported."  Id. at 35 (quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1181 (8th Cir. 1998)).  "Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false."  Id.; see also Novartis Consumer Health, Inc. v. Johnson & Johnson – Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 587 (3d Cir. 2002) (holding that "only an unambiguous message can be literally false") (emphasis in original) (citing United Indus. Corp., 140 F.3d at 1181).  Similarly, so-called "puffery" or "puffing" is "non-actionable."  Clorox, 228 F.3d at 38.  "'Puffing' is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely," id. (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:38 (4th ed. 1997)), and is "characterize[d]" by "vague or subjective statement[s]." Id.; see also W. Page Keeton, et al., Prosser & Keeton on Torts § 109, at 757 (5th ed. 1984) (defining "puffing" as "a seller's privilege to lie his head off, so long as he says nothing specific, on the theory that no reasonable [consumer] would believe him, or that no reasonable [customer] would be influenced by such talk").  However, "[a] specific and measurable advertisement claim of product superiority . . . is not puffery."  Clorox, 228 F.3d at 38.

     With these standards in mind, the Court will now turn to each section of the infomercials that, according to Euro-Pro, conveys a literally false message.

    **1.**     **Assertion that TwinTank Renders Other Steam Mops "Obsolete"**

First, Euro-Pro objects to the assertion, made at various points throughout the TwinTank infomercial, that the TwinTank renders other steam mops "obsolete." Hearing Transcript, D. 31 at 11-12, 18-21; Motion, D. 7 at 1 ¶ b; Euro-Pro Reply, D. 28-1 at 5-6. The various infomercial excerpts at issue are as follows:

> Hoover Voice-Over: The following is a paid program for the new Hoover TwinTank Steam Mop that makes other steam mops obsolete. Keep watching to try it risk-free for 30 days.

TwinTank Video, D. 1-3 at 0:02-0:09; see also Video Transcript, D. 11-1 at 3.[4]

> Hoover Voice-Over: If you're thinking about getting a steam mop, here's a dirty little secret: You can't scrub greasy dirt off your hands with just hot water *[showing man washing his hands without soap]*, and mops with just steam can't completely clean. *[Showing Shark]* But simply add cleaning solution and watch that tough dirt melt away. *[Showing man washing his hands with soap]* That's what Hoover did to their steam mop. *[Showing artist's rendering of TwinTank's two separate tanks]* We added extra cleaning technology to make other steam mops obsolete. *[Showing Shark and TwinTank side by side, with the text "Obsolete" above the Shark]*

TwinTank Video, D. 1-3 at 0:53-1:19; see also id. at 9:09-9:38, 16:36-17:04, 24:49-25:17 (excerpt repeated in nearly identical form three additional times in the infomercial); Video Transcript, D. 11-1 at 3-4, 12-13, 19-20, 29.

> Host Tony: You know, we are all excited about this. This is the steam mop that makes all other steam mops obsolete. It's the Hoover TwinTank Steam Mop.

TwinTank Video, D. 1-3 at 2:21-2:28; see also Video Transcript, D. 11-1 at 5.

> Host Tony: All right. Here's the news. Mops with just steam can't completely clean. Think about it. If hot steaming water alone cleaned everything, you wouldn't need to add detergent to a dishwasher to clean your dishes *[showing a dishwasher with a bottle in front of it]*; right, Rachel?

---

[4] Unless otherwise noted, the excerpts from the infomercials reprinted in this opinion are taken from the Court's review of the infomercial videos themselves, D. 1-3 and 1-2. Where those videos differ from the transcripts provided by EuroPro, D. 11-1 and 11-2, the Court has relied on the videos rather than the transcripts thereof. The Court notes that in the few instances in which the videos and the transcripts appeared to differ, the differences were minor and immaterial.

Co-Host Rachel:  That's right, Tony, you do.  Because some dirt can only be broken up and removed with detergent to boost cleaning power.  *[Showing artist's rendering comparing "Other Steam Mops - Steam Only" with "Hoover TwinTank Steam Mop - With Cleaning Solution]*  Now, a steam mop is great for both cleaning and sanitizing, but sometimes just steaming and scrubbing aren't enough to clean everything.  *[Showing Shark]*

Host Tony:  That's right.  And this is precisely why Hoover added TwinTank Technology to help revolutionize the steam mop.  You're about to find out how it works and why it makes other steam mops obsolete.  *[Showing the text "Hoover TwinTank Steam Mop Makes Other Steam Mops Obsolete"]*

TwinTank Video, D. 1-3 at 3:18-3:44; see also Video Transcript, D. 11-1 at 6.

Host Tony:  . . . Look what can happen if hard wood is continually exposed to water.  Check that out.  It's warped.  Nobody wants floors like that, Rachel.

Co-Host Rachel:  That's right, Tony.  But with the TwinTank Steam Mop, just adjust the setting on the Solution Control Dial to "Tough Stains," and this will remove the stains faster so it's safer for your hard wood floors.  I mean, check this out.  It's quick.  It's easy.  It's picking it up in no time at all, and you're done.  This is just another reason why the Hoover TwinTank Steam Mop makes other steam mops obsolete.  *[Showing the text "Hoover TwinTank Steam Mop Makes Other Steam Mops Obsolete"]*

TwinTank Video, D. 1-3 at 6:50-7:21; see also Video Transcript, D. 11-1 at 10.

Co-Host Rachel:  . . . [H]ere's your opportunity to call and get your 30-day risk-free trial to try this major breakthrough in steam mop technology and to find out why it makes other steam mops obsolete.  *[Showing the text "Hoover TwinTank Steam Mop Makes Other Steam Mops Obsolete"]*

TwinTank Video, D. 1-3 at 8:57-9:08; see also id. at 16:24-16:35 (same statement repeated by Host Tony and accompanied by identical graphic); see also Video Transcript, D. 11-1 at 12, 19.

Hoover Voice-Over:  Now here's a special exciting offer from Hoover:  If you already own a water-only ordinary steam mop that's now obsolete *[showing a woman crying next to the text "Already own an obsolete steam mop?"]*, we'll buy it back *[showing the same woman make an open-mouthed expression apparently meant to connote surprise and joy, next to the text "We'll buy it back!"]* so you can get the new Hoover TwinTank Steam Mop.

TwinTank Video, D. 1-3 at 11:58-12:10, 19:25-19:37, 27:38-27:50 (identical excerpt repeated three

times in the infomercial); see also VideoTranscript, D. 11-1 at 15, 22, 31.

> Host Tony:  . . . [W]e've been putting the Hoover TwinTank Steam Mop through some of the toughest challenges *[showing TwinTank and Shark side by side next to the text "Toughest Challenges"]* to show why it makes other steam mops obsolete. We can't forget that one of the major reasons that people buy steam mops is to sanitize and disinfect their floors while they clean.

TwinTank Video, D. 1-3 at 12:48-13:02; see also Video Transcript, D. 11-1 at 15.

> Co-Host Rachel:  The Solution Control Dial lets you inject the Steam Plus Solution for improved cleaning.  This is why the Hoover TwinTank Steam Mop makes other steam mops obsolete.

TwinTank Video, D. 1-3 at 14:43-14:53; see also Video Transcript, D. 11-1 at 17-18.

> Co-Host Rachel:  . . . [W]e've been putting the Hoover TwinTank Steam Mop through some of the toughest challenges to show why it makes other steam mops obsolete.  *[Showing Shark and TwinTank side by side, with the text "Obsolete" above the Shark]*

TwinTank Video, D. 1-3 at 20:16-20:23; see also Video Transcript, D. 11-1 at 22.

> Host Tony:  *[After using the TwinTank to clean tiles grouted with unsealed grout]* This is another reason – right? – why Hoover TwinTank Steam Mop makes other steam mops obsolete.  *[Showing the text "Hoover TwinTank Steam Mop Makes Other Steam Mops Obsolete"]*

TwinTank Video, D. 1-3 at 21:20-21:26; see also Video Transcript, D. 11-1 at 24.

> Host Tony:  Got some black shoe polish right here.

> Co-Host Rachel:  All right.

> Host Tony:  Oh yeah.  Put a little elbow grease.  It's tough.  It's stubborn.  But not stubborn enough.  Gone.

> Co-Host Rachel:  Nice.

> Host Tony:  Now, removing difficult messes like these is another reason why the Hoover TwinTank Steam Mop makes other steam mops obsolete.  *[Showing the text "Hoover TwinTank Steam Mop Makes Other Steam Mops Obsolete"]*

TwinTank Video, D. 1-3 at 23:11-23:28; see also Video Transcript, D. 11-1 at 27.

Euro-Pro argues that the repeated explicit statement that the TwinTank makes other steam mops "obsolete" is literally false.  TTI argues in response that these obsolescence claims littered throughout the infomercial are mere puffery.  TTI Brief, D. 20 at 16-17.  At this early stage of the litigation the Court finds it likely that TTI's position will prevail.  In this circuit, the category of puffery encompasses vague and general assertions that a product's superiority renders competing products comparatively useless.  See Clorox, 228 F.3d at 39 (holding that statements such as "[s]ay goodbye to [rival products]" are "precisely the type of vague, unspecified boasting that typifies puffery").

Euro-Pro's reliance on Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489 (5th Cir. 2000), does not alter this analysis.  In Pizza Hut, Pizza Hut objected to rival Papa John's "Better Ingredients.  Better Pizza." campaign, part of which included comparisons regarding specific pizza ingredients – e.g., asserting that Papa John's' "sauce was made from 'fresh, vine-ripened tomatoes,' which were canned through a process called 'fresh pack,' while its competitors . . . make their sauce from remanufactured tomato paste"; that Papa John's "used 'clear filtered water' to make its pizza dough, while the 'biggest chain' uses 'whatever comes out of the tap'"; and that "Papa John's . . . gives its yeast 'several days to work its magic,' while 'some folks' use 'frozen dough or dough made the same day'" – followed by a recitation of the slogan "Better Ingredients.  Better Pizza."  Pizza Hut, 227 F.3d at 492.  The question of Lanham Act liability was tried to a jury.  Id. at 493.  After a three-week trial, the court denied Papa John's motion for a judgment as a matter of law, and, by special verdict, the jury found that the slogan, the sauce claims and the dough claims were "false or misleading" but that other ingredients claims were not.  Id. at  493, 493 n.2 and n.3.  The district court, relying on the special verdict, concluded that the slogan was puffery when used independently

but was not puffery when "juxtaposed with . . . false and misleading statements," including the sauce and dough claims, and enjoined Papa John's advertising campaign. Id. at 494 (quoting district court judgment). On appeal, the Fifth Circuit reversed and ordered the district court to enter judgment for Papa John's. Id. at 503. The Fifth Circuit agreed that the slogan was puffery, id. at 498-99, agreed further that "there was sufficient evidence in the record to support the jury's conclusion that Papa John's sauce and dough advertisements were misleading – but not false – in their suggestion that Papa John's ingredients were superior," id. at 501, and agreed further still that the slogan became misleading (but not literally false) when used in conjunction with the sauce and dough claims, id. at 501-02, but found that Pizza Hut "failed to adduce evidence establishing that the misleading statement of fact conveyed by the ads and the slogan was material to the consumers to which the slogan was directed," and "because such evidence of materiality is necessary to establish liability under the Lanham Act" for allegations of misleading (but not literally false) advertising, held that "the district court erred in denying Papa John's motion for judgment as a matter of law." Id. at 502.

Pizza Hut is of little support to Euro-Pro. First, to the extent Euro-Pro argues that TTI's assertion that the TwinTank "makes other steam mops obsolete" is by itself actionable non-puffery, Pizza Hut stands for precisely the opposite conclusion. Second, to the extent Euro-Pro argues that the meaning and specificity of the "obsolete" slogan changes when read in conjunction with other, more specific factual statements in the same advertising campaign, the Pizza Hut court reached that conclusion only after reviewing the evidence submitted in a three-week jury trial, not on the basis of the limited record available at the preliminary injunction stage as in Pizza Hut.[5] Third, and most

_____

[5] More importantly, as discussed further below, the Court has reviewed the additional sections of the TwinTank infomercial to which EuroPro objects (and which could serve to contextualize the "obsolete" slogan) and at this early stage of the litigation the Court is not

importantly, even when reviewing the "Better Ingredients.  Better Pizza." statement in conjunction with more specific statements, the <u>Pizza Hut</u> court found only that the slogan read in context was misleading, not that it was literally false.  Here, Euro-Pro has proceeded solely on the theory that the "obsolete" slogan is literally false, both when viewed alone and when read in context. Accordingly, <u>Pizza Hut</u>, although not binding on this Court, reinforces rather than undermines the Court's conclusion that Euro-Pro is not likely to succeed on its claim that the "obsolete" slogan used throughout the TwinTank infomercial is literally false and thus runs afoul of the Lanham Act.

### 2.  TwinTank Comparison To the Shark - Permanent Marker Demonstration

Second, Euro-Pro objects to a section of the TwinTank infomercial that purports to show a TwinTank and a Shark as each steam mop is used to clean pieces of tile soiled with permanent marker ink.  Hearing Transcript, D. 31 at 5-11, 13; Euro-Pro Preliminary Injunction Motion, D. 7 at 2 ¶ c; Euro-Pro Reply, D. 28-1 at 3-4.  The section of the infomercial at issue proceeds as follows:

> Co-Host Rachel:  Okay. Here we have one of the leading steam mops which only cleans with steam.  *[Indicates the Shark]*  Now, let's see how it compares to the Hoover TwinTank Steam Mop with TwinTank Technology on getting rid of tough permanent marker that our dirt team right here, Heather and Dee Dee *[indicates two assistants]*, have just put on these two tiles.  *[Indicates two white tiles, each with a thick squiggle of black ink drawn across the tile]*

> Host Tony:  And remember, just like you can't scrub greasy dirt off your hands with just hot water *[while Tony speaks, one assistant manually wipes each tile with a damp white cloth, which has no effect on the marker; simultaneously, Rachel presses a button on the front of the Shark and a hissing sound is heard]*, a steam mop with just steam can't completely clean.  Maybe that's because the leading brand just has steam.  Hoover has the solution.  *[Superimposed image of the TwinTank's "solution control dial" being turned to the "tough stains" setting appears alongside text stating "Solution Control Dial – On Highest Setting"]*

> *[Zoom to close-up image of the TwinTank, emitting steam, being pushed back and forth across a tile, removing the marker ink entirely]*

persuaded that these sections contain literally false statements.

Co-Host Rachel:  Well, let's try over here.  *[Zoom to close-up image of the Shark, emitting steam, being pushed back and forth across a separate tile, only partially removing the marker ink, appearing alongside text stating "Steam Only Mop – Highest 'Scrub' Setting"]*  Well, looks like it's a little bit more permanent over here, Tony.  But that's because a steam mop that cleans with just steam can't get it completely clean.

Host Tony:  I'll swoop in with the Hoover TwinTank and save the day.  *[Zoom to close up image of an only-partially-soiled tile located next to the Shark; when the TwinTank is pushed back and forth across the tile, the marker ink is removed completely]*

Co-Host Rachel:  I mean, it's just that easy with TwinTank Technology and the Solution Control Dial.  And as you can see, the Hoover TwinTank Steam Mop is truly a steam mop for cleaning things that other steam mops can't.  *[Zoom to a split-screen, captioned "Instant Replay," showing on the left side of the screen the TwinTank removing the ink from a tile and on the right side of the screen the Shark removing only some of the ink from a tile]*

TwinTank Video, D. 1-3 at 4:04-5:00; <u>see also</u> Video Transcript, D. 11-1 at 7-8.

Euro-Pro objects to this section of the infomercial on two grounds.  First, Euro-Pro argues that Hoover's repeated assertion that cleaning "with just steam can't completely clean" is at odds with the statements elsewhere in the infomercial that a TwinTank set on its "Steam Only" setting is able to disinfect surfaces, <u>see, e.g.,</u> TwinTank Video, D. 1-3 at 13:21-13:44; Video Transcript, D. 11-1 at 16, and, according to Euro-Pro, "[b]oth of their claims cannot be true."  Euro-Pro Brief, D. 8 at 9.  Euro-Pro is clearly mistaken on this point.  As Euro-Pro's own brief makes clear, the concepts of "cleaning" and "disinfecting," while related, are nonetheless distinct and not synonymous.  <u>See</u> Euro-Pro Brief, D. 8 at 9 n.2 (noting that "[t]he English dictionary defines 'disinfect' as 'to rid of microorganisms potentially harmful to man, [especially] by chemical means,'" while "'clean' means 'to get rid of dirt, soil, etc.'") (quoting Collins English Dictionary - Complete & Unabridged, HarperCollins Publishers (10th ed.), available at http://dictionary.reference.com); <u>see also</u> Euro-Pro Brief, D. 8 at 9 n.2 (noting that the federal

15

Environmental Protection Agency has created formal standards defining "disinfection" for hard, non-porous surfaces, but failing to assert that the EPA defines or enforces standards regarding "cleanliness").  It is entirely possible that a mop using water-based steam, and no other cleaning solution, could rid a surface of microorganisms potentially harmful to humans without completely ridding the surface of soil, dirt or other non-harmful debris free of microorganisms.  See Miller Decl., D. 22 at ¶ 27 (stating that "a surface may appear to be clean to the naked eye, but may still contain germs and bacteria.  Likewise, a surface . . . may be disinfected (that is free of germs or bacteria), but not clean, because there is a stain.  In other words, a disinfected surface may not necessarily appear clean, and a clean surface is not necessarily disinfected.  These are two distinctly different concepts").  Indeed, the infomercial does not appear to be misleading on this point, drawing analogies to using soap in addition to hot water to wash one's hands not for disinfection purposes but in order to "scrub greasy dirt off your hands," Video Transcript, D. 11-1 at 4, 7, 12, 19-20, 29, and to adding detergent to a dishwasher to clean, but not to disinfect, dirty dishes.  See TwinTank Video, D. 1-3 at 3:19-3:31 (Co-Host Rachel,  stating that "some dirt can only be broken up and removed with detergent to boost cleaning power.  Now, a steam mop is great for both cleaning and sanitizing, but sometimes just steaming and scrubbing aren't enough to clean everything," while standing in front of a dishwasher and holding a bottle of detergent); see also Video Transcript D. 11-1 at 6 (same).  To be sure, consumers could conceivably misconstrue the TwinTank video's assertions regarding cleaning compared to disinfection, and thus be misled into believing that, for example, cleaning "with just steam can't completely disinfect," but Euro-Pro has neither asserted this theory nor provided the Court with the type of evidence necessary to support a misleading advertisement (as opposed to a literal falsity) claim.

16

Second, Euro-Pro argues that the permanent marker demonstration is literally false because its purported results were not corroborated by independent tests, leading Euro-Pro to allege that the demonstration must have been "rigged."  Euro-Pro Brief, D. 8 at 8.  Euro-Pro provided evidence to the Court suggesting that the demonstration results were faulty or unverifiable.  See, e.g., Product Testing Report, D. 12-3 at 2-5, 11; Testing Photographs, D. 28-1 at 16-22.  TTI, in turn, submitted evidence to the contrary.  See, e.g., TTI Floor Care Test Procedure, D. 20-5 at 3-9; Kirkendall Decl., D. 21 at ¶¶ 5-6; Declaration of Acquirgy Executive Vice President for Production Harry Greene, D. 23 at ¶¶ 4-7.  The parties also spent considerable time arguing whether the demonstration fairly presented the Shark's performance (for example, arguing about whether the TwinTank was moved across the marker stain more slowly or in more strokes than the Shark was, or whether the Shark was adequately warmed up prior to the demonstration).  Hearing Transcript, D. 31 at 5-14, 18, 52-60. However, the first step the Court must take in analyzing Euro-Pro's allegations of literal falsity is to determine what (if any) specific unambiguous message is either explicitly stated or necessarily implied by the section of the infomercial at issue, Clorox, 228 F.3d at 34-35; Novartis Consumer Health, 290 F.3d at 587, and at this early stage of the litigation Euro-Pro has not persuaded the Court that the permanent marker demonstration, whether or not it is verifiable, conveys such an unambiguous message.  Consumers could draw various messages from the demonstration, ranging from "the TwinTank always cleans any hard surface better than the Shark" to "under certain conditions, the TwinTank may clean tile better than the Shark," to "the tile on the left has been stained more severely than the tile on the right."  Neither these nor any other specific conclusion, however, is necessarily implied by the demonstration, precluding a finding of literal falsity.  Clorox, 228 F.3d at 34-35.  Certainly, Euro-Pro may have at the very least succeeded in casting at least some

17

doubt on the accuracy of demonstration by, for example, pointing out that the "before" version of the marker-stained tile placed next to the Shark is likely not the same tile shown in the "after" version. Compare TwinTank Video, D. 1-3 at 4:06-4:10, 4:15-4:27 (showing, adjacent to the Shark, a tile soiled with a permanent marker squiggle containing three peaks) with id. at 4:35-4:44 (showing the Shark mopping a tile soiled with a permanent marker squiggle containing four peaks). However, the burden of showing that the demonstration is in fact misleading rests with Euro-Pro, Clorox, 228 F.3d at 33, 36, and here EuroPro has neither alleged that the demonstration is misleading nor provided the sort of evidence usually used to make such a showing. Id. at 36.

At this early stage of the proceeding Euro-Pro has not shown that it is likely to prevail on its claim that the permanent marker demonstration is literally false and thus in violation of the Lanham Act. Nor does the permanent marker demonstration, when taken together with the infomercial's repeated assertions that the TwinTank makes other steam mops "obsolete," convert the puffery of the "obsolete" claim into an actionable literally false statement.

### 3.    TwinTank Comparison to the Shark - Grease Demonstration

Next, Euro-Pro objects to a section of the TwinTank infomercial that purports to show a TwinTank and a Shark as each steam mop is used to clean a large piece of flooring soiled with automotive grease. Hearing Transcript, D. 31 at 11-21; Motion, D. 7 at 2 ¶ c; Euro-Pro Reply, D. 28-1 at 4-5. The section of the infomercial at issue proceeds as follows:

> *[Rachel, holding a TwinTank, and Tony, holding a Shark, stand on the rear portion of a large beige square of tiled flooring. On the front portion of the square, two assistants kneel; one, wearing yellow gloves, is rubbing black grease on to the square immediately in front of the TwinTank. There is a black smear of grease immediately in front of the Shark]*
>
> Co-Host Rachel:  And to really see the incredible grease-cutting ability of the TwinTank Steam Mop, our Hoover Dirt Team, Joe and Phil here, stained this vinyl

floor with heavy automotive grease.  *[Zoom in to show the two assistants rubbing grease onto the flooring]*  Thanks a lot, guys.

Host Tony: . . .Why don't we see how the Hoover TwinTank performs versus this well-known water-only steam mop.  *[Indicates the Shark]*  Sound good?

Co-Host Rachel:  I like what you're saying, Tony.

Host Tony: Here we go.  *[Zoom in to show both mops at once, moving forward once and backwards once across the grease.  The grease next to the TwinTank is removed entirely; the grease next to the Shark is partly removed, with the remainder smeared into a long linear shape]*  And even though mine is on "Scrub," it appears as if it could actually be on "Smear," because once I'm through and I smeared it, my mess is worse than what I started with.  Look at this.

Co-Host Rachel:  Wow.  I mean, look at that.  *[Zoom to what appears to be a repeat of the footage of the two steam mops moving back and forth across the grease, with the text "Instant Replay" superimposed above the mops]*  There is no smearing problem here.  The Hoover TwinTank instantly removed the automotive grease completely.  The Hoover TwinTank Steam Mop is truly a steam mop for cleaning things that other steam mops can't.

TwinTank Video, D. 1-3 at 7:43-8:29; <u>see also</u> Video Transcript, D. 11-1 at 11-12.

Euro-Pro's objection here is similar to its objection to the permanent marker demonstration.

Euro-Pro argues that the grease demonstration is literally false because its purported results were

not corroborated by independent tests, leading Euro-Pro to allege that the demonstration must have

been "rigged." Euro-Pro Reply, D. 28-1 at 4.  As with the marker demonstration, Euro-Pro provided

evidence to the Court suggesting that the demonstration results were faulty or unverifiable, <u>see, e.g.</u>,

Product Testing Report, D. 12-3 at 6-11, TTI submitted evidence to the contrary, <u>see, e.g.</u>, TTI Floor

Care Test Procedure, D. 20-5 at 3-9; Kirkendall Decl., D. 21 at ¶ 9; Greene Decl., D. 23 at ¶ 8, and

the parties spent considerable time arguing about whether the demonstration fairly presented the

Shark's performance (for example, arguing whether the TwinTank was moved across its grease stain

more slowly or with a twisting motion that was not applied when the Shark was moved across its

grease stain, or whether the Shark was adequately warmed up prior to the demonstration).  Hearing Transcript, D. 31 at 6, 11-18, 52-57.  Euro-Pro's position here is unavailing for the same reasons discussed with regard to the permanent marker demonstration.  The grease demonstration neither explicitly states nor necessarily implies a specific unambiguous message and thus Euro-Pro does not at this stage of the litigation appear likely to prevail on its assertion that the demonstration is susceptible to a literal falsity claim.  Clorox, 228 F.3d at 34-35; Novartis Consumer Health, 290 F.3d at 587.  Nothing in the record forecloses the possibility that the grease demonstration is nonetheless misleading, but to date Euro-Pro has neither asserted such an objection nor provided the sort of evidence necessary to support a misleading (as opposed to literal falsity) claim.  Clorox, 228 F.3d at 33, 36.

### 4.      WindTunnel - "Sealed Suction" Demonstrations

Next, Euro-Pro objects to four sections of the WindTunnel infomercial that purport to show the extent of the WindTunnel's suction power in a sealed, airtight environment.  Hearing Transcript, D. 31 at 21-28; Motion, D. 7 at 2 ¶ f, 3 ¶ k; Euro-Pro Reply, D. 28-1 at 7-10.  The first section of the infomercial at issue, involving the WindTunnel purportedly using its suction power to collapse five-gallon water cooler jugs, proceeds as follows:

Host Tony:  Let's see just how powerful the WindTunnel Air is.  *[Host Tony and Co-Host Rachel stand next to a tree-shaped vertical rigging of pipe with nine plastic water jugs attached to it.  Assistants are shown using screwdrivers to tighten gaskets attaching the jugs to the pipe rigging]*  You got a hammer over there I can borrow?  *[An assistant hands a hammer to Co-Host Rachel]*

Co-Host Rachel:  Uh-huh.  *[Host Tony holds a plastic jug on the ground while Co-Host Rachel hits it with the hammer]*  It's gotta crush this, right?

Host Tony:  Come on down here.  Give it a few whacks with this hammer and see if you can do some damage.  *[Co-Host Rachel continues hammering on the jug, with no noticeable effect.  The text "5 Gallon Water Cooler Jug" appears on the left of*

*the screen]* Nice. That's tough. Let me give it a couple. *[Host Tony takes the hammer and repeatedly hits the jug, with no noticeable effect]* Okay. I think we all get the point; right?

Co-Host Rachel: Yep.

Host Tony: Now let's see if the WindTunnel Air can crush not just one, but nine jugs *[indicates the tree-shaped rigging]* at the same time.

Co-Host Rachel: Uh-huh.

Host Tony: Now, the Hoover Clean Team attached the suction hose to a plastic pipe, which in turn is attached to nine empty five-gallon water cooler jugs. *[The screen shows the rigging up close, with gaskets clearly visible where the jugs meet the pipe rigging. In very small font, text that appears to read "Suction tested per IEC60312-1" appears at the bottom of the screen]* Just to prove there that the WindTunnel there never loses suction, they filled the dirt cup to the brim with dirt. *[The screen shows the WindTunnel dirt cup full of dirt]*

Co-Host Rachel: I don't know, Tony. This should be really cool to see.

Host Tony: It's going to be amazing. Heather, turn it on. *[An assistant turns on the WindTunnel]*

Co-Host Rachel: Turn it on. *[The text "Incredible Suction Power" appears at the left of the screen. The jugs collapse one at a time, with sequential numbers - 1, 2, 3, and so on - appearing next to each jug as it collapses]* Four, five, six, seven, eight, nine. Are you kidding me?

Host Tony: Unbelievable. *[Indicates his watch]* That was under ten seconds.

Co-Host Rachel: Incredible suction power. You saw it yourself. *[The screen again shows the rigging up close, with the gaskets clearly visible]*

WindTunnel Video, D. 1-4 at 2:32-3:32; see also Video Transcript, D. 11-2 at 5-6.

The second section of the infomercial at issue, involving the WindTunnel purportedly lifting

weights, proceeds as follows:

Host Tony: Now, our dirt team has placed 120 pounds in this airtight acrylic cylinder. *[Co-Host Rachel indicates a clear cylinder containing a stack of weights, superimposed with the text "120 lbs. Iron Barbell Weights"]*

21

Co-Host Rachel:  Phil over here *[indicates an assistant holding a WindTunnel]* is going to put the Hoover WindTunnel Air over the opening *[indicates a slit in the top of the cylinder]* to see if its incredible suction can lift the 120 pounds. *[The assistant placed the WindTunnel on top of the slit]*

Host Tony:  And we also filled the dirt cup just to prove that there's absolutely no loss of suction.

Co-Host Rachel:  Turn it on.

Host Tony:  Turn it on. *[A second assistant turns on the WindTunnel]* This is going to blow my mind.

Co-Host Rachel:  I can't believe this. *[Superimposed text stating "Lifting 120 lbs of Weight - No Loss of Suction" appears at the right of the screen. In smaller font, the text "Gasket added do not try this at home" appears at the bottom of the screen]* Look at that.

Host Tony: It is raising the Titanic. *[While the text remains on the screen, the weights slowly rise to the top of the clear cylinder]*

Co-Host Rachel:  That is a lot of weight.  Unbelievable, right? *[The text regarding the gasket disappears from the screen; the text regarding the 120 lbs of weight remains]* Now, remember, the only thing that's pulling up all this weight is sheer suction. It's amazing. *[The second assistant turns off the WindTunnel and the weights slowly fall to the bottom of the cylinder]*

Host Tony:  That is absolutely mind-blowing.  And you know, if the Hoover WindTunnel Air's suction can lift 120 pounds, imagine how clean your home will be.

Co-Host Rachel:  That's right.

[Customer testimonials omitted]

Host Tony:  You know, Rachel, it's amazing to see the WindTunnel Air lift 120 pounds of bulk weight. *[Split screen image of the WindTunnel on the left and the cylinder with the weights rising on the right]* But let's see how it stands up against the competition, picking up dirt on bare floors and carpets. *[Indicates WindTunnel and second vacuum on a bare wooden floor]*

WindTunnel Video, D. 1-4 at 11:30-12:43; <u>see also</u> Video Transcript, D. 11-2 at 14-15.

The final two sections at issue, involving the WindTunnel purportedly attaching itself to a

wall via suction power, proceed as follows:

> Host Tony:   [W]e're going to see another no-loss-of-suction demonstration. *[Indicates a series of WindTunnels stuck to a wall, with superimposed text stating "Amazing Wall!"]* You're not going to believe this.  One of the great wonders of the world:  the Climbing Wall of WindTunnel Air Uprights.

WindTunnel Video, D. 1-4 at 16:05-16:17; <u>see also</u> Video Transcript, D. 11-2 at 20.

> Host Tony:   Rachel, look at all this suction power.  *[Indicates a series of WindTunnels stuck to two walls, with superimposed text stating "Never Loses Suction"]* Oh, my gosh.  *[Host Tony and Co-Host Rachel walk forward, with WindTunnels stuck to the walls on either side of them]*
>
> Co-Host Rachel:  Well, I promised that we would show you the most amazing demonstrations of power and no loss of suction.
>
> Host Tony:  Only Hoover.  Let me put this one up on the wall.  What do you think?
>
> Co-Host Rachel:  All right.  *[Host Tony lifts a WindTunnel from the ground and places its base against a wall.  The WindTunnel remains stuck to the wall]* That's number 15, Tony.  *[Superimposed text stating "15 WindTunnels Stuck To The Wall With Their Own Suction!" on the right side of the screen and, in a smaller font, "Gasket added do not try this at home" on the bottom of the screen]* All stuck to the wall with their own suction power.  *[Host Tony raises his hands in the air]* Unbelievable.  Wow.

WindTunnel Video, D. 1-4 at 23:51-24:27; <u>see also</u> Video Transcript, D. 11-2 at 28.

Euro-Pro argues that these demonstrations are literally false because they convey that the demonstrations establish the WindTunnel's performance during carpet or floor cleaning, when in fact the demonstrations establish only the WindTunnel's performance under unrealistically ideal conditions.  Euro-Pro submitted evidence suggesting that the WindTunnel's performance in the demonstrations was only possible under sealed suction conditions and disputing whether sealed suction performance and the industry standards applying thereto are appropriate reflections of real world performance.  <u>See, e.g.</u>, Declaration of Euro-Pro Director of Testing and Evaluations for Vacuums Karyn Medler, D. 13 at ¶¶ 6-12; Supplemental Medler Decl., D. 28-1 at 23-27 ¶¶ 3-11;

Test Data, D. 28-1 at 32-51.  TTI submitted evidence disputing some of the details in the Medler declaration submitted by Euro-Pro, but not necessarily contradicting its ultimate conclusions.  See, e.g., Miller Decl., D. 22 at ¶¶ 15-21; Test Report, D. 22-1 at 2-4; Performance Results, D. 22-2 at 2-4.  Nonetheless, Euro-Pro's evidentiary assertions are beside the point at this stage of the litigation.  The sections of the infomercial at issue here make clear that the demonstrations are being conducted under special and idealized conditions, see, e.g., WindTunnel Video, D. 1-4 at 2:32-3:32 (clearly showing gaskets and pipe-rigging); id. (showing assistant adjusting gaskets); id. at 11:39 (stating that weights have been placed in an "airtight acrylic cylinder"); id. at 11:57-12:03, 24:05-24:09 (text stating "Gasket added do not try this at home" appears on screen), and the infomercial stops well short of any express claim that the suction demonstrations establish how the WindTunnel would perform when cleaning floors or carpets in real-world conditions, explicitly inviting consumers to draw their own conclusions.  See, e.g., Video Transcript, D. 11-2 at 15 (stating "if the Hoover WindTunnel Air's suction can lift 120 pounds, imagine how clean your home will be") (emphasis added).  All in all, the suction power demonstrations neither explicitly state nor necessarily imply a specific false message, and thus it appears unlikely that Euro-Pro will prevail on its assertion that the demonstrations provide the basis for a literal falsity claim under the Lanham Act.  Clorox, 228 F.3d at 34-35.

### 5.     WindTunnel Comparison to the Shark Navigator - Chair Demonstration

Next, EuroPro objects to a section of the WindTunnel infomercial that purports to show a WindTunnel, a Shark Navigator and a third vacuum attempting to vacuum underneath a chair. Transcript, D. 31 at 28-30; Motion, D. 7 at 3 ¶ m; Euro-Pro Reply, D. 28-1 at 10-11.  The section of the infomercial at issue proceeds as follows:

Co-Host Rachel:  Now you think any major brand of vacuum could fit under a chair with this much space between the seat and the floor *[superimposed text indicates the bottom of the chair is 11.5 inches above the floor; the floor below the chair is soiled]*, but it's not true.

Host Tony:  You want to give it a shot, Rachel?

Co-Host Rachel:  All right.  I'm going to turn this on.  *[Turns on a vacuum that is neither the WindTunnel nor the Shark Navigator]*  Try to get under there.  First of all, it doesn't even fit *[indicates that the vacuum cannot fit under the chair while the vacuum's handle remains vertical]*, so I lift it up *[lowers the handle towards the floor and parallel to the floor, causing the base of the vacuum to lift above the floor; rolls the vacuum forward and backwards with no visible effect on the soiled area below the chair]* and –

Host Tony:  Look at this one.  *[Indicates Shark Navigator]*  This one is even worse.  Watch this.  *[Turns on Shark Navigator]*  Okay, yeah.  I would like to vacuum under my chair today.  *[Indicates that the Shark Navigator cannot fit under the chair while its handle remains mostly vertical]*  Look at this.  You can't even fit it under there.  *[Lowers the handle towards the floor and parallel to the floor, causing the base of the vacuum to lift above the floor; rolls the vacuum forward with no visible effect on the soiled area below the chair]*

Co-Host Rachel:  Not very easy, but check this out.  The Hoover WindTunnel Air is so well designed *[indictaes WindTunnel]* that it is the only one *[turns on WindTunnel]* that can effectively get under the chair *[lowers the handle towards the floor and parallel to the floor; the base of the vacuum remains on the floor; rolls the vacuum forward and backward, removing the soil]* and clean everything single inch under this.  Look at that.

Host Tony:  Beautiful.  So, you know, unless you actually like moving furniture *[co-host Rachel turns off WindTunnel]*, you need to get a Hoover WindTunnel Air.

Co-Host Rachel:  I don't like moving furniture.

WindTunnel Video, D. 1-4 at 20:48-21:43; <u>see also</u> Video Transcript, D. 11-2 at 24-25.

Euro-Pro argues that this demonstration was inaccurate and unfair to the Shark Navigator because Host Tony failed to tilt the Shark Navigator's handle to the left consistent with the Shark Navigator's design for fitting under low clearances, and thus the demonstration "failed to afford the Shark Navigator an equal opportunity to perform" as required by industry standards.  Euro-Pro

Reply, D. 28-1 at 10.  Euro-Pro has submitted evidence regarding the relevant industry standards.

Supp. Medler Decl., D. 28-1 at 30 ¶ 17; Standard Test Method for Access Depth Under Furniture

of Vacuum Cleaners, D. 28-1 at 72-74.  This Court's role, however, is to evaluate whether the

infomercial sections at issue violate the Lanham Act, not industry standards.  Here, the chair

demonstration does not explicitly state that it is being conducted pursuant to any specific industry

standard (or that it is consistent with such standards generally), nor is such a conclusion a necessary

implication of the demonstration, so the demonstration's alleged violation of industry standards does

not by itself provide the basis for a literal falsity claim.  Clorox, 228 F.3d at 34-35.  Nor does the

chair demonstration necessarily imply any specific message; consumers could draw various

messages ranging from the message most feared by Euro-Pro, to wit, "the Shark Navigator is unable

to vacuum under chairs 11.5 inches or lower," to the message that Euro-Pro asserts best explains

what actually happens during the demonstration, to wit, "in order to vacuum under chairs 11.5

inches or lower with a Shark Navigator, you'll need to do more than simply lower the handle –

maybe consider twisting it to one side."  Neither of these nor any other specific conclusion, however,

is necessarily implied by the demonstration, and accordingly Euro-Pro has not shown that it is likely

to prevail on its claim that the chair demonstration is literally false and thus in violation of the

Lanham Act.  Clorox, 228 F.3d at 34-35.

### 6.      WindTunnel Comparison to the Shark Navigator - Filter Demonstration

Next, Euro-Pro objects to a section of the WindTunnel infomercial that purports to show that

a high-efficiency particulate air ("HEPA") filter in the WindTunnel is more durable, or at least more

difficult to tear in half, than other dust filters in two competing products, including the Shark

Navigator.  Hearing Transcript, D. 31 at 35-38; Motion, D. 7 at 2 ¶¶ g-h; Euro-Pro Reply, D. 28-1

at 6-7.  The section of the infomercial at issue proceeds as follows:

> Host Tony:  The Hoover WindTunnel Air has a filter with HEPA media.  *[An artist's rendering of an air filter in the middle of the screen with words such as "dirt," "dander," "allergens," "dust," and "pollen" moving from left to right across the screen until they reach the artist's rendering of the air filter, at which points the words stop moving and appear to be "caught" in the filter, while arrows emerge from the right of the filter.  In very small font, the words "Down to 0.3 microns" appears at the bottom left of the screen]* It captures 99.97% of allergy-causing dust, pollen and pet dander.

> Co-Host Rachel:  That's right, Tony.  *[The artist's rendering disappears from the screen to reveal Tony standing next to a WindTunnel with an air filter placed next to it and Co-Host Rachel standing next to two vacuums, including the Shark Navigator, each with an air filter placed in front of it]* And check this out.  You see these other leading-brand vacuums right here?  *[Indicates the two competitor vacuums, including the Shark Navigator]* Now they all have dust-trapping filters, but they are not all the same.  This one right here, for example *[indicates the filter in front of the Shark Navigator, as the text "Foam Rubber" appears in the top left of the screen]*, is made of foam rubber.  *[Co-Host Rachel picks up the filter, removes a detachable cover piece, and places the detachable cover back in front of the Shark Navigator]* I mean, come on.  *[Co-Host Rachel holds up the remainder of the filter and tears it in half]* How long do you think that's gonna last?

> Host Tony:  *[Picks up the filter in front of the third vacuum]* And when this one needs to be cleaned, you have to throw it out and buy a new one, so it can cost you up to $40 bucks a year.  *[The text "Cost Up To $40 Per Year!" appears in the bottom left of the screen and then Host Tony places the filter back in front of the third vacuum]* Now take a look at the Hoover WindTunnel Air filter.  *[Host Tony picks up the filter next to the WindTunnel]* First of all, there's a complete 360-degree seal around this super strong honeycomb material *[Host Tony runs his finger around the perimeter of the filter, twists the filter back and forth, and returns the filter to its original shape]* that is fully washable.  *[The text "360 Degree Seal - Fully Washable" appears in the bottom right corner of the screen]* So Rachel, you don't have to buy a new one every time it needs cleaning.  And look how sturdy this thing is.  *[Host Tony continues twisting the filter back and forth and returning it to its original shape, then pats it twice against his palm]*

> Co-Host Rachel:  That is going to last a whole lot of cleanings.

WindTunnel Video, D. 1-4 at 13:58-14:41; <u>see also</u> Video Transcript, D. 11-2 at 17-18.

> Euro-Pro objects to this section of the infomercial on two grounds.  First, Euro-Pro claims

that the WindTunnel does not, in fact, capture 99.97% of the allergy-causing dust, pollen, and pet dander that enters the vacuum, Euro-Pro Memo, D. 8 at 13 n.7; Euro-Pro Reply, D. 28-1 at 6-7, and Euro-Pro has submitted evidence suggesting that independent testing confirms as much.  See, e.g., Medler Decl., D. 13 at ¶ 13; Test Report, D. 13-1 at 2; Supp. Medlar Decl., D. 28-1 at ¶ 14.  But Euro-Pro concedes that "Hoover's HEPA filter may trap 99.97% of dust, pollen, pet dander, and dirt that passes through the filter," Euro-Pro Memo, D. 8 at 13 n.7 (emphasis in the original), and the infomercial does not assert more than that.  The specific quotation is "[t]he Hoover WindTunnel Air has a filter with HEPA media.  It captures 99.97% of allergy-causing dust, pollen and pet dander." Video Transcript, D. 11-2 at 17.  The term "it" in the latter sentence can clearly be read to refer to the filter with HEPA media, not to the WindTunnel; the infomercial does not expressly require nor necessarily imply an alternate reading.  See also Video Transcript, D. 11-2 at 12 (Hoover Voice-Over stating "[t]he Hoover WindTunnel Air comes with a reusable primary filter and a filter with HEPA media that traps 99.97 percent of dust, pollen, pet dander and dirt"); id. at 21 (same); id. at 30 (same).  Accordingly, given that Euro-Pro does not dispute that the WindTunnel's HEPA filter itself may trap 99.97% of dust, pollen, and pet dander, Euro-Pro is unlikely to prevail on its assertion that the infomercial's various statements conveying this factual assertion are literally false.

Second, Euro-Pro objects that the Shark Navigator filter torn in half in the filter demonstration is the Shark Navigator's pre-motor filter, not its wholly separate HEPA filter, which is the more appropriate filter to compare to the WindTunnel HEPA filter.  Euro-Pro Memo, D. 8 at 13; Supp. Medler Decl., D. 28-1 at 28 ¶ 13.  TTI does not dispute that the filter torn in half is the Shark Navigator's pre-motor filter, but points out that the WindTunnel filter shown in the demonstration is the WindTunnel's pre-motor filter, not its HEPA filter, see Miller Decl., D. 22 at

¶ 22 (stating "Hoover clearly compares the durability of the WindTunnel Air's <u>pre-motor filters</u> (not the HEPA filter as set forth by Ms. Medler) to the pre-motor filters of two of its competitors") (emphasis in original), and thus the demonstration "is an apples-to-apples comparison."  TTI Brief, D. 20 at 19.  Although the infomercial switches quickly from discussing the WindTunnel's HEPA filter while showing an artist's rendering of the HEPA filter, <u>see</u> WindTunnel Video, D. 1-4 at 14:00-14:05, to comparing the "dust-trapping filters" included in the WindTunnel and its competitors, <u>see</u> <u>id.</u> at 14:07-14:41, without informing consumers that the WindTunnel's dust-trapping filter is distinct from its HEPA filter, the filter demonstration does not appear to include any explicit statements or necessarily implied messages that are literally false.  Accordingly, at this point it does not seem likely that Euro-Pro will prevail on its literal falsity Lanham Act claim with regard to the filter demonstration.

### 7.  WindTunnel "Dust Cup" Claim

Next, Euro-Pro objects to Hoover's claim that the WindTunnel has a "super-sized capacity dust cup which holds 25% more dirt than the competition," Video Transcript, D. 11-2 at 12, 21, 30, an assertion repeated word-for-word three times in the WindTunnel infomercial.  Hearing Transcript, D. 31 at 30-34; Motion, D. 7 at 2 ¶ h; Euro-Pro Brief, D. 8 at 12 n.5; Euro-Pro Reply, D. 28-1 at 8-9.  Each time the assertion is repeated in the infomercial, the screen shows a dust cup being emptied into a trash can, with the text "Holds 25% More Dirt Than The Competition" superimposed at the top left of the screen and, in much smaller font, the text "Within it's [sic] competitive class" at the bottom of the screen.  WindTunnel Video, D. 1-3 at 9:06-9:11, 17:49-17:55, 26:01-26:07.

Euro-Pro argues that the asserted 25% figure is literally false because the WindTunnel's dust

cup, when measured according to American industry standards, is only 9% larger than the Shark Navigator's dust cup. Euro-Pro Brief, D. 8 at 12 n.5; Medler Decl., D. 13 ¶ 15; Euro-Pro Reply, D. 28-1 at 8-9. TTI argues that for dust cup size measurements, a European industry standard using elastomeric pellets is superior to the American standard that relies on cork pellets, TTI Brief, D. 20 at 22-23; Miller Decl., D. 22 at ¶ 26, and that under the European standard "[t]he Hoover WindTunnel Air upright cup capacity is 25% larger on average compared to other uprights weighing less than 16 lbs with accessories but without cord," Miller Decl., D. 22 at ¶ 26, a conclusion reached after Hoover "conducted the [European standard] test on multiple upright vacuum cleaners." Id. For its part, Euro-Pro notes that the 25% figure asserted in the infomercial makes no mention whatsoever of averages, and that even under the European standard "the WindTunnel's dust cup is not 25% larger than the Navigator's," that "the WindTunnel and Navigator dust cups are virtually equal," and that "Hoover's self-identified class of vacuum," which is never defined in the infomercial itself and is explained for the first time in TTI's court filings, "includes Euro-Pro's NV355, which has a larger dust cup than the WindTunnel." Supp. Medlar Decl., D. 28-1 at ¶ 16.

Euro-Pro's objection to the asserted 25% figure is stronger than many of its other objections to TTI's infomercials. The asserted figure is much more specific, and much more readily falsifiable, than general claims regarding obsolescence or than demonstrations asking consumers to "imagine" what the demonstration might imply about a product's use in the home. The Court does not discount the importance of Euro-Pro's unrebutted showing that the WindTunnel's dust cup is not 25% larger than the Shark Navigator's dust cup when measured under any industry standard. Nonetheless, at this stage of the litigation, the Court cannot say it is likely that TTI's asserted 25% figure could be deemed not merely misleading but literally false. The phrase "25% more than the competition"

could be read to mean either 25% more than each competitive product (the reading proposed by

Euro-Pro) or 25% more than an average of all competitive products (the reading proposed by TTI).

The absence of any mention of averages reinforces (but does not compel) Euro-Pro's preferred

reading, and the opacity of the unmodified phrase "competitive class" does little to help (but does

not preclude) TTI's preferred reading; the Court's role, however, is not to choose which reading is

sounder but to determine whether, after "considering the advertisement in its entirety," one reading

is so obvious that "the audience would recognize the claim as readily as if it had been explicitly

stated." Clorox, 228 F.3d at 35.  The Court cannot say, on the current record before it, that this is

the case here in regard to this claim.

### 8.   WindTunnel - Assembly Demonstration

Finally, Euro-Pro objects to a section of the WindTunnel infomercial that purports to show

children, each with a different disassembled vacuum (including a WindTunnel, a Shark Navigator,

and other vacuums), racing to assemble their vacuum in the shortest period of time.   Hearing

Transcript, D. 31 at 65; Euro-Pro Reply, D. 28-1 at 11.   The section of the infomercial at issue

proceeds as follows:

Host Tony: *[Screen shows a series of disassembled vacuum parts]* You know, some
vacuums seem to require an advanced mechanical degree to assemble, but not the Hoover
WindTunnel Air. *[Screen shows Host Tony and Co-Host Rachel standing amidst five small
children and each child has a pile of vacuum parts]* It doesn't require any tools because it
comes virtually preassembled.   Now just to prove it, we've got five kids, ages five and six
*[screen alternates between individual close-zoom shots of each child's face]*, with five of
the leading brands of vacuums.  We are going to ask them to put these together.   Now, we've
already taken the units out of the box. *[Screen shows a WindTunnel being removed from a
cardboard box.   The text "WindTunnel Air Comes Pre-Assembled" appears at the bottom
right of the screen]* We did not assemble anything.

Co-Host Rachel: Okay everybody.   Let's see who can put theirs together first so it's
ready to vacuum.  Ready?  Get set.  And go! *[All five children stoop down to pick
up some of the vacuum parts in front of them.  Images of individual children moving*

31

*vacuum parts are interspersed with more panoramic images of all five children at once. The child closest to the WindTunnel, which is separated into three parts, finishes assembling the WindTunnel before any other child has assembled a vacuum. The screen shows images of each of the latter four children, one at a time, apparently looking at the child closest to the WindTunnel. The image switches back to a panoramic image of all five children as the child closest to the WindTunnel raises her arms above her head. The text "Hoover WindTunnel Air - The Winner!" appears at the bottom right of the screen]*

Child: Done! *[Host Tony raises his arms above his head. Co-Host Rachel claps. Co-Host Tony high-fives the child who assembled the WindTunnel]*

Co-Host Rachel: All right. Good job.

WindTunnel Video, D. 1-4 at 6:21-7:10. <u>See also</u> Video Transcript, D. 11-2 at 9-10.

Euro-Pro asserts that "Hoover admits to individually coaching each child on how to assemble the vacuums and then giving the children multiple opportunities to practice before filming the demonstration that actually appears in the infomercial," asserts further that "Hoover does not disclose either material fact," and on the basis of these two assertions argues that the infomercial "<u>misleads</u> consumers into believing they can assemble the WindTunnel just as easily without any instruction or prior assembly experience." Euro-Pro Reply, D. 28-1 at 11 (emphasis added). As noted repeatedly above, Euro-Pro has not submitted the type of evidence typically required to prove a Lanham Act misleading claim, <u>Clorox</u>, 228 F.3d at 33, 36, nor has Euro-Pro pressed any theory other than literal falsity. The assembly demonstration certainly does include specific, possibly falsifiable statements (that the WindTunnel "doesn't require any tools" to assemble; that the children are in fact "ages five and six," etc.) but these are not in dispute and the Court sees no need for further comment.

Accordingly, having reviewed Euro-Pro's various objections to the TwinTank and WindTunnel infomercials, the Court cannot conclude at this point that Euro-Pro is likely to prevail

on the merits of its literal falsity Lanham Act claims.  Since Euro-Pro's Lanham Act claims are the sole basis for all the various claims asserted by Euro-Pro, the Court finds that Euro-Pro has failed at this juncture to demonstrate a likelihood of prevailing on the merits in this case.

## B.    Other Factors for Injunctive Relief

Given the Court's conclusion that Euro-Pro has not established a likelihood of success on the merits means that the Court need not discuss the remaining factors for injunctive relief, namely the likelihood of irreparable harm, the balance of the equities, or whether the requested injunctive action would comport with the public interest.  New Comm Wireless Servs., Inc., 287 F.3d at 9.  In the interest of completeness, however, the Court will briefly address the additional factor of irreparable harm.

Euro-Pro argues that "[b]ecause Hoover is engaging in false advertising through direct comparative claims, irreparable harm is presumed upon a showing of likelihood of success on the merits."  Euro-Pro Brief, D. 8 at 22 (citing 5 McCarthy on Trademark & Unfair Competition § 27:37 (4th ed. 2012) (noting that "[w]here the challenged advertising makes a misleading comparison to a competitor's product, irreparable harm is presumed); N. Am. Med. Corp. v. Axiom Worldwide, 522 F.3d 1211, 1227 (11th Cir. 2008)) (other citations omitted).  Euro-Pro does not dispute that there is no such presumption for claims that are not directly comparative.  See, e.g., McCarthy, supra, § 27:37 (noting that "if the false advertising is noncomparative and makes no direct reference to a competitor's product, irreparable harm is not presumed") (internal footnotes omitted); N. Am. Med. Corp., 522 F.3d at 1226-27 (concluding that "the district court erred when it presumed that [the plaintiffs] would suffer irreparable harm in the absence of a preliminary injunction merely because [the defendant]'s advertisements are literally false . . . . Proof of falsity is generally only sufficient

33

to sustain a finding of irreparable injury when the false statement is made in the context of comparative advertising between the plaintiff's and defendant's products"). Here, at least some of the infomercial sections to which Euro-Pro objects – for example, the repeated assertion in the TwinTank infomercial that cleaning "with just steam can't completely clean," <u>see</u> TwinTank Video, D. 1-3 at 1:02-1:06, 3:06-3:10, 4:25-4:29, 16:40-16:44, 24:53-24:57; Video Transcript, D. 11-1 at 4, 6-7, 20, 28, or the "sealed suction" demonstrations in the WindTunnel infomercial, <u>see</u> WindTunnel Video, D. 1-4 at 2:32-3:32, 11:30-12:43, 16:05-16:17, 23:51-24:27; Video Transcript, D. 11-2 at 5-6, 14-15, 28 – fall into the latter category of non-comparative claims. Establishing a likelihood of success on the merits of these claims would not relieve Euro-Pro of its burden regarding irreparable harm.

The Court would not be able to conclude that Euro-Pro can carry that burden at this point in the proceedings. Euro-Pro has asserted that absent an injunction its products will lose "sales, shelf space and market share" to Hoover's products, Euro-Pro Brief, D. 8 at 23; <u>see also</u> Barrocas Decl., D. 9 at ¶¶ 15-21 (speculating about the effects of TTI's infomercials on Euro-Pro's sales, shelf space and market share), and it notes that during the brief (to date) course of this litigation, the retail chains Target and Sears have each decided to cease carrying certain Shark-branded steam mop products to "make room" for the TwinTank. Supp. Barrocas Decl., D. 28-2 at ¶¶ 3-4. However, Euro-Pro fails to allege, let alone show, that this purported harm is related in any way to the infomercials at issue. Indeed, the Shark products "dropped" by Target do not include the Shark Steam Mop Model No. S3601 at issue in this case, <u>compare</u> Supp. Barrocas Decl., D. 28-2 at ¶ 3 (discussing Target's decision to "drop" Model No. MV2010, a combination steam mop and vacuum, and Model No. S3250, a lower price point "Shark Quick" model) <u>with</u> Barrocas Decl. D. 9 at ¶ 4

(discussing the Shark Professional Steam Pocket Mop Model No. S3601 at issue in this case), and according to TTI's vice-president of marketing, Sears ceased ordering Sharks for resale in the spring of 2011, almost one year <u>prior</u> to the first airing of the TwinTank infomercial.  Supp. Kirkendall Decl., D. 35 at ¶ 4.  TTI further alleges that Sears subsequently resumed selling the Shark in its stores and sells "a full line of Shark steam products and vacuums" via the Sears website, and that the number of Shark Navigator products available at Target has increased since the airing of the WindTunnel infomercial.  <u>Id.</u> at ¶¶ 4, 6.  Accordingly, it is not clear that Euro-Pro would be entitled to preliminary injunctive relief even if it had established a likelihood of success on the merits.

## VI.     Conclusion

For the reasons discussed above, the Court DENIES Euro-Pro's motion for a preliminary injunction.

/s/ Denise J. Casper
United States District Judge

35